IN THE UNITED STATES DISTRICT COURT
NORTHERN DISTRICT OF GEORGIA
ATLANTA DIVISION

| | | |
|---|---|---|
| PAUL ZWIER, | : | |
| | : | |
| Plaintiff, | : | Civil Action File No. |
| | : | |
| v. | : | _____ |
| | : | |
| EMORY UNIVERSITY and | : | |
| JAMES B. HUGHES, JR., | : | **JURY TRIAL DEMANDED** |
| | : | |
| Defendants. | : | |

## COMPLAINT

Plaintiff Paul Zwier ("Plaintiff" or "Professor Zwier") brings this Complaint against his employer, Defendant Emory University ("Emory"), and James B. Hughes, Jr. ("Hughes") individually (collectively "Defendants"), showing the Court as follows:

### STATEMENT OF CLAIMS, JURISDICTION, AND VENUE

1.

This is a civil action against Emory and Hughes for unlawful race-based discrimination and retaliation in employment, in violation of 42 U.S.C. § 1981 ("Section 1981"). Plaintiff seeks monetary damages and other relief.

2.

Plaintiff asserts a breach of contract claim against Emory.

3.

This is a civil action against Hughes for libel *per se*.

4.

This Court has jurisdiction over Plaintiff's federal claims pursuant to 28 U.S.C. § 1331 and § 1343, and supplemental jurisdiction over Plaintiff's state law claims against Emory and Hughes pursuant to 28 U.S.C. § 1367.

5.

Venue is proper in this Court pursuant to 28 U.S.C. § 1391, because the violations of Plaintiff's civil rights alleged herein, the breach of contract, and the libel *per se* were committed in this judicial district, and Defendants reside in this judicial district.

## **PARTIES**

6.

Emory is a private research university located in Atlanta, Georgia. Emory University School of Law is a graduate school of Emory. Emory may be personally served with process through its registered agent, the Emory Office of the General Counsel.

7.

Hughes was a member of the Emory faculty and served a two-year term as the Interim Dean of the Law School beginning in September 2017 and ending in August 2019.  He may be personally served with process.

8.

Professor Zwier is a tenured professor of law at Emory University School of Law.

## FACTUAL ALLEGATIONS RELEVANT TO ALL CLAIMS

### Plaintiff's Employment with Emory

9.

Professor Zwier has been an accomplished and well-respected member of the law school faculty since 2003, where he has taught torts, evidence, advanced international negotiations, and authored numerous works on equity and inclusion, race relations, racism in courts, and the rule of law and related topics.

10.

Professor Zwier has directed Emory's award-winning Trial Techniques program for the past 15 years, as part of which each year more than 100 practicing lawyers and judges from all over the country come to Emory to teach practical trial techniques to law students enrolled in the program.

11.

Prior to the fall of 2018, in the 15 years that Professor Zwier taught law school classes and directed the Trial Techniques program to over five thousand law students, no students or faculty filed any formal grievances or complaints against Professor Zwier.   During that same time frame Professor Zwier was never subjected to any discipline by Emory.

**<u>August 2018 Classroom Incident</u>**

12.

On August 23, 2018, three days into the fall law school semester, Professor Zwier was teaching his first-year torts class and discussing the case of *Fisher v. Carrousel Motor Hotel, Inc.*, 424 S.W.2d 627 (Tex. 1967).

13.

In *Fisher*, a Black mathematician employed by NASA was invited to a meeting at a local hotel in Alabama to discuss his studies of telemetry equipment. During a dinner following the technical meeting, a hotel employee ejected the plaintiff from the hotel dining room. It was alleged that the employee grabbed a dinner plate from the plaintiff's hand and shouted that the establishment "would not serve 'a Negro.'"

14.

Professor Zwier's lecture was focused on the way the words people use can massively impact potential legal claims.

15.

Professor Zwier questioned what the effect would be if the hotel employee used the word "n***er" in his statement while ejecting Mr. Fisher from the restaurant to stimulate class discussion.

16.

Professor Zwier's use of the racist term was part of the class discussion and used as an example of how a tortfeasor's words could elevate the severity of the tort being committed.

17.

Professor Zwier did not direct the word at any individual student, but instead used it as a teaching moment and integral part of the lecture and discussion of the *Fisher* case.

18.

On the evening of August 23, 2018, Professor Zwier received a phone call from Hughes who stated that African American students were now complaining about his use of the n-word in his class discussion that day.

19.

Given the brief use of the word during an unscripted discussion with his class, Professor Zwier stated to Hughes that he did not immediately recall using the word but did immediately agree to issue an apology to the students.

20.

Professor Zwier also received an e-mail from the President of the Black Law School Students Association ("BLSA") who asked to attend Zwier's class with other members of the BLSA the following day, to which Zwier gladly agreed and promised to apologize if anyone felt he or she was made to feel uncomfortable by his lecture.

21.

On August 24, 2018, Professor Zwier apologized to his class with the BLSA representatives present with the explanation that his intention was to confront and expose racial slurs as terrible words that could constitute offensive battery and justify intentional infliction of emotional distress claims, all important concepts in a torts class for first-year law students.

22.

Black law students in the class fully engaged in the discussion, as well as the BLSA representatives, and any student issues related to the August 23 classroom

lecture, to the extent there were any, appeared resolved.

23.

On the evening of August 24, 2018, however, Hughes e-mailed Professor Zwier stating that he, the Provost of Emory, and the President of Emory unilaterally decided Professor Zwier would be removed from his first-year classes and referred the matter to the Emory Office of Equality and Inclusion ("OEI") to investigate.

24.

Professor Zwier was shocked given the closure he believed he achieved with his students.

25.

Then, again on August 24, 2018, without further warning or discussion with Zwier, Hughes sent an open letter to the Emory law community, which was published on Emory University's website and in the campus newspaper, wherein Hughes harshly condemned Professor Zwier's undescribed actions as "unacceptable" and that his "use of this ... or any racial slur reflects a tradition of white supremacy that we actively reject at Emory."

26.

Hughes' August 24, 2018 letter further stated that "[w]hen insulting

conversation is normalized, it creates a hostile environment and it undermines our institutional values."

27.

In his widely published letter, Hughes grossly misconstrued Professor Zwier's conduct on August 23 indicating that Professor Zwier had improperly used a racial slur in class without an academic purpose, portraying Professor Zwier as a racist, and igniting a wave of antipathy toward Professor Zwier throughout the Emory campus. Hughes' communications provided no context about how the word was used in connection with a class discussion about torts during the Civil Rights era in Alabama.

28.

Hughes made these false, misleading, and defaming statements about Professor Zwier with full knowledge of their inaccuracy and absolute lack of context.

29.

Despite being made aware of the actual facts and underlying circumstances of the August 23, 2018 classroom lecture, Hughes acted to defame Professor Zwier in a manner that has caused permanent reputational damage to Professor Zwier and his career.

30.

Because of the libelous way Hughes communicated the August 23, 2018 incident to the Emory community, Professor Zwier issued two additional public apologies to the Emory community on August 27, 2018 and September 9, 2018.

31.

On the same day that Professor Zwier sent his September 9, 2018 apology to the Emory community, Hughes, without justification, sent another letter to the Emory community falsely stating Zwier has "admitted inappropriately using" the n-word and had "taken full responsibility for the harm its use has done to the immediately affected students, the Law School community, and the broader Emory community," further grossly misconstruing the actions and events that had occurred up to that point.

32.

As part of this public and misplaced condemnation, Hughes also announced that Emory would take additional steps against Zwier, including a prohibition against Professor Zwier teaching mandatory first-year courses for two years, Professor Zwier's required participation in bias training by OEI, and his voluntary revision of his teacher's manual to "include suggestions of ways in which faculty

who use his text might avoid offending students when covering racially sensitive materials."

33.

When publicly chastising Professor Zwier, Hughes never provided any context for the circumstances surrounding Zwier's classroom lecture and case-based statements and instead simply laid full blame at Zwier's feet, portraying Zwier as someone who intentionally used a racial slur in class, all without any formal investigation.

**November 2018 Suspension**

34.

As of Hughes' September 9, 2018 Emory-wide e-mails, the parties considered that the classroom incident was fully resolved. Professor Zwier was approved and scheduled to teach three law school classes in the Spring semester.

35.

As part of that resolution, Hughes also mandated that Zwier keep open office hours for any student who wished to discuss the August 23 incident.

36.

On October 31, 2018, Justin Tolston, a Black student pursuing his L.M.M. or Masters, requested a meeting with Zwier in his office and Zwier accepted.

37.

Tolston was an adult student who had previously graduated with his Juris Doctorate from another law school. Tolston was not a student in Professor Zwier's torts class, had never taken any other courses taught by Professor Zwier, and was not registered to take any future classes with Professor Zwier.

38.

In fact, Emory mistakenly admitted Tolston to the law school for the 2018 fall semester as part of a discontinued dual L.L.M. program with a European law school in Budapest that had not been a functioning program for between seven to ten years.  Rather than recognizing and correcting its error, Emory created a Master of Law program out of whole cloth to placate Tolston's animosity about Emory's mistake.

39.

Prior to the October 31, 2018 meeting, despite having no first-hand knowledge of Professor Zwier or the August 23 class lecture, Tolston actively campaigned to seek Zwier's termination from the law school and was photographed holding signs that read "I am not a n***er," and "Fire Zwier!"

40.

Tolston has a well-documented history of participating in race-related

protests at other academic institutions. He has been arrested multiple times. After a confrontation with a female professor at the University of Nebraska/Lincoln, that university did a threat assessment concerning his conduct with her. Tolston is the author of a self-published book, <u>Black from Nebraska</u>, a rambling and sometimes incoherent discourse regarding his encounters with police, professors, protests, and arrests for traffic violations and drug possession. Notably, Tolston regularly uses the word "n***er" throughout his written works. After leaving Emory and beginning a law practice, Tolston was subsequently arrested for assault and battery of a former boyfriend.

41.

During their October 31, 2018 meeting, Tolston aggressively accused Professor Zwier of having a racist family upbringing and being an innate racist. Tolston repeatedly used the word "n**ger" in making his accusations throughout the meeting with Professor Zwier.

42.

Shocked by the unrelenting accusations, Professor Zwier responded by relating his upbringing in a family where racism was actively combatted by his parents and further shared an anecdote that other white people in his past had accused Zwier of being a "n***er-lover" because of his publicly espoused views

on racial equality.

43.

When accused of being a racist, Professor Zwier specifically responded to Tolston by saying, "Do you want to hear about my family so I can talk to you about what my attitudes are?"

44.

Professor Zwier was not aggressive or confrontational in response to these false and terrible accusations, but instead shared deeply personal memories about his and his family's experience.

45.

Tolston, however, pounced on this opportunity and threatened to use this well-intended anecdote to blackmail Zwier into issuing a public statement that Emory University was racist in both its hiring and admissions practices.

46.

Tolston had orchestrated the entire office meeting to find some fodder to allow him to make the threat.

47.

Tolston stated that if Professor Zwier did not jointly issue the statement on Emory's supposed racist practices, he would publish an op-ed piece in the

*Washington Post* demanding Zwier's termination from the law school.

48.

Professor Zwier refused Tolston's threats and reported the incident to Hughes, who expressed distrust about Tolston's motives.

49.

Hughes had a similar interaction with Tolston previously. Tolston had threatened Hughes with publishing false statements about Hughes' reaction to the classroom incident.  Hughes' response to Tolston was to "apprise him of the rules of engagement" and to threaten Tolston with a slander or libel suit if he published the false statements.

50.

Professor Zwier was contacted by a second student on October 31, 2018, who stated she was a friend of Tolston and wanted to talk to Zwier about their conversation earlier that day. Zwier again agreed as he was required to do by Hughes' conditions on his continued teaching.

51.

 Professor Zwier met with the second student on November 2, 2018, and given what had transpired with Tolston, Zwier and the second student agreed to record the meeting.

52.

During the recorded conversation, the student conveyed her belief that Zwier used the word "n***er" in his earlier meeting with Tolston.

53.

To correct this misconception, Zwier explained exactly what occurred and *spelled out*, *rather than repeated*, the actual words, "n***er-lover," that he used during the meeting with Tolston.

54.

Professor Zwier again reported this meeting to Hughes and provided him with a copy of the audio recording of his second meeting due his correct concerns that he was now being targeted.

55.

Following the meeting, the second student admittedly circulated augmented and manipulated versions of the recording to other students and law school staff in order to portray the meeting with Professor Zwier in a more negative light than what had actually occurred.

## Hughes Further Defames and Suspends Zwier

56.

Rather than supporting Professor Zwier, on November 7, 2018, Hughes e-mailed the faculty and law school community falsely stating in the e-mail that:

> It appears **Paul Zwier has used this "n-word" within our community, again**. This time it is reported that he first used the word during a conference with an African American student, and then used it again in a meeting with another student whose race is unknown to me.

57.

Hughes made this statement despite being in possession of the recording that demonstrated that the statement was false.

58.

Again, Hughes issued these statements with zero context about the underlying facts of the meetings between Zwier and the students.

59.

In response, Professor Zwier reached out to Hughes and the law school faculty and pointed out the total inaccuracy of Hughes' e-mail.

60.

Again, rather than listening to or recounting Professor Zwier's version of events, on November 9, 2018, Hughes sent an e-mail to the faculty and students

again falsely stating:

> I recently received reports that **Professor Zwier used for a second time the same racial slur during a conversation at the law school**.  I have begun the process of gathering the facts regarding these allegations and working with University officials to outline a process to address this situation.

### 61.

On November 12, 2018, Dean Hughes suspended Zwier and placed him on paid administrative leave, which was again publicly announced to the Emory community via an e-mail in which Hughes falsely stated the suspension was based on "multiple reports" that Zwier had used the "n-word."

### 62.

The Emory OEI completed its investigation of Professor Zwier in December 2018, but Emory and Hughes kept Professor Zwier on administrative leave through the end of the 2018-2019 school year, banishing him from the law school campus and his law school office.

### 63.

The OEI investigation proves that any alleged student and faculty outrage regarding Professor Zwier, which was minimal, resulted from the misleading statements issued by Hughes and false narratives spread by Tolston to faculty and

students.

64.

Tolston himself refused to communicate with OEI or Emory's administration or otherwise participate in the investigation of Professor Zwier's actions.

65.

After disputes between Tolston and the BLSA President about what happened with Zwier, and threats by Tolston that he would call for her resignation if she didn't call for Zwier's firing, the BLSA President also did not speak with OEI as part of its investigation.

66.

Following the OEI investigation, Emory initially determined that Professor Zwier should be allowed to return to teaching following a suspension of yet to be determined duration during which he would not teach first-year students, along with other conditions.

67.

No additional investigation of the August and October 2018 incidents took place between December 2018 and June 2019, and Zwier did not engage in any contact with Emory students during this time frame.

68.

Before and during Professor Zwier's suspension, multiple Emory faculty and students stated that it was Professor Zwier's White race that made it inappropriate for him to use any variation of the "n-word."

69.

Other Black faculty at Emory have used the word "n**ger" as part of their academic teaching and publishing without reproach, discipline or dismissal.

70.

The Emory Department of African American Studies prominently published the fully articulated n-word in a poem by departing Emory Professor Nagueyalti Warren in a newsletter that was circulated throughout campus after Professor Zwier was suspended.  No discipline or investigation was done with respect to any faculty member of that Department after the publication of the n-word.

71.

Philosophy Professor George Yancy, who is Black, writes about how he uses the n-word, regardless of whether it appears in any text he is discussing, without sanction, in his teaching at Emory.  One of these articles was published only months before Zwier was suspended.   https://www.chronicle.com/article/The-Ugly-Truth-of-Being-a/243234.

72.

An adjunct professor who used a variation of the n-word aimed at Native Americans in the fall semester of 2019 justified and defended its use by stating he was Native American and therefore allowed to use the word. The Law School did not suspend the Native American adjunct professor, terminate his employment, or issue a campus-wide missive publicly condemning him, equating his statement to the advocation of white supremacy, like Hughes did with Professor Zwier.

73.

Multiple academic freedom groups like the Foundation for Individual Rights in Education ("F.I.R.E.") and legal luminaries from Emory such as William Carney publicly called for Professor Zwier's reinstatement and censure of Emory for its actions multiple times since December 2018.

**Hughes Attempts to Terminate Professor Zwier**

**In Retaliation for his Complaining of Race Discrimination**

74.

No additional facts regarding the August and October 2018 incidents were unearthed or discovered by Hughes or Emory after December 2018.

75.

In May 2019, after approximately six months of languishing in professional

purgatory, Professor Zwier, however, reached out to the Emory Faculty Hearing Committee Chair ("FHC") Arya Stein and complained that he was being treated differently by Emory and Hughes because of his race. The FHC is a body of five Emory University faculty members who hear, deliberate and make recommendations regarding discipline and termination of tenured faculty.

76.

In response to Zwier's complaints of race discrimination and the public support for him, on June 10, 2018, Hughes sent a letter to the Chair of the Faculty Hearing Committee ("FHC") at Emory announcing his decision to terminate Professor Zwier's tenured employment.

77.

Professor Zwier responded to this letter and the FHC held a full evidentiary hearing on October 4, 2019 over whether Hughes had articulated sufficient grounds to terminate Professor Zwier's tenure.

78.

Hughes and Emory were represented by multiple King and Spalding attorneys during this hearing and, in addition to the presence of counsel at the hearing, the FHC required substantial pre- and post-hearing briefing submissions.

79.

As a tenured or continuous track professor of law, any termination of Professor Zwier's employment at the school of law is governed by the Emory Statement of Principles Governing Faculty Relationships, or "the Gray Book," which is incorporated into Professor Zwier's contract with Emory.

80.

With respect to tenured educators like Professor Zwier, the Gray Book mandates:

> A continuous appointment is not to be terminated by the University except….
>
> For one or more of the following reasons: moral delinquency, neglect of academic duty, incompetence, permanent physical or mental incapacity for which there is no reasonable accommodation, or other such adequate cause.

The Gray Book, §§1, 12(c).

81.

At the hearing, Hughes and Emory unbelievably were unable to articulate which of these required grounds provided the basis for his decision to terminate Professor Zwier.

82.

After the presentation of evidence, including both live witnesses and

affidavit testimony, the FHC issued its decision on January 27, 2020 and found that Hughes and Emory failed to demonstrate adequate cause to revoke Professor Zwier's tenure.

83.

The FHC ruled that there was no evidence Professor Zwier's actions equated to moral delinquency and there was no evidence that called Professor Zwier's competency as a teacher into question or evidence that he had neglected *any* of his academic duties or institutional responsibilities.

84.

The FHC immediately reinstated Professor Zwier to teaching.

85.

Before finding in Zwier's favor, however, the FHC refused to issue its determination for multiple months because of unfounded fears pressed upon it by the law school that a favorable decision in Zwier's favor would cause of a wave of antipathy and negative publicity for the law school and Emory.

86.

Those fears did not bear fruit, but they did delay the resolution of the hearing for a significant period of time, further damaging Professor Zwier.

87.

Hughes' and Emory's false statements about and illegal treatment of Professor Zwier also caused him to become unemployable in the legal field either as a law school professor, private attorney or consultant, causing him significant financial harm and irreparably damaging his professional reputation.

88.

Professor Zwier lost significant consultant and independent contractor employment arrangements outside of the law school that caused Zwier to lose hundreds of thousands of dollars in income.

## SUBSTANTIVE CLAIMS

## COUNT 1: RACE DISCRIMINATION AGAINST EMORY& HUGHES (SECTION 1981)

89.

Plaintiff incorporates all of the foregoing allegations and numbered paragraphs as if fully restated herein.

90.

Emory and Hughes subjected Professor Zwier to disparate treatment due to his race (White) in violation of 42 U.S.C. § 1981 because Professor Zwier admittedly would have been treated differently if his race was Black under the

same circumstances.

91.

Emory and Hughes have taken adverse employment actions against Professor Zwier and his race was a motivating factor for Defendants' adverse employment actions.

92.

As a result of Hughes' and Emory's discriminatory actions, Professor Zwier suffered a loss of income and benefits, and also caused Professor Zwier to suffer other monetary and non-monetary damages, the amount of which shall be determined at trial.

93.

Hughes' and Emory's discriminatory conduct was willful and intentional, with reckless indifference to Professor Zwier's federally protected rights.

## **COUNT 2: RETALIATION AGAINST EMORY & HUGHES**

## **(SECTION 1981)**

94.

Plaintiff incorporates all of the foregoing allegations and numbered paragraphs as if fully restated herein.

95.

Section 1981, like Title VII, forbids retaliating against an employee who opposes unlawful employment discrimination.

96.

Professor Zwier opposed unlawful employment discrimination when he complained about the race discrimination he was subjected to by Emory and Hughes following his being placed on administrative leave.

97.

Prior to Professor Zwier complaining of race discrimination, Emory intended to suspend him but return him to teaching.  After Professor Zwier complained of race discrimination, Emory and Hughes moved to terminate him.

98.

Hughes and Emory retaliated against Professor Zwier by, among other actions, placing him on indefinite administrative leave and moving to terminate his employment.

99.

Hughes' and Emory's actions were and are intended to chill Professor Zwier's exercise of his federally protected rights.

100.

Hughes' and Emory's conduct caused Professor Zwier to suffer economic and non-economic damages including lost earnings and benefits, lost opportunities for employment, pain and suffering, and emotional distress, for which Defendants are liable.

## COUNT 3: BREACH OF CONTRACT AGAINST EMORY

101.

Plaintiff incorporates all of the foregoing allegations and numbered paragraphs as if fully restated herein.

102.

The mandates and terms and conditions of the Gray Book are a part of Professor Zwier's contract of employment with Emory.

103.

None of the conditions that are required for the termination of a tenured professor under the terms and conditions of the Gray Book are or were present here.

104.

By moving to terminate Professor Zwier's contract without sufficient cause, Emory breached its contract of employment with Professor Zwier.

105.

By failing to timely resolve Professor Zwier's complaints of termination, Emory breached its contract of employment with Professor Zwier.

106.

As a direct result of Emory's intentional breach of contract, Professor Zwier suffered direct damages in the form of lost wages, benefits, pre-judgment and post-judgment interest, and reasonable attorneys' fees.

107.

Pursuant to O.C.G.A. § 51-12-10, Professor Zwier is also entitled to recover remote damages occasioned by Defendant's knowing and intentional breach of his contract.

## COUNT 4: LIBEL *PER SE* AGAINST HUGHES

108.

Plaintiff incorporates all of the foregoing allegations and numbered paragraphs as if fully restated herein.

109.

Hughes on at least four occasions put in writing to the Emory community and ultimately to the world at large that Professor Zwier had in fact used racial slurs in acts equating to espousing white supremacy and racism.

110.

Hughes made these statements despite being in possession of information and evidence from Zwier and others demonstrating that Hughes' characterization of Professor Zwier's words was false.

111.

Hughes made these statements with the understanding that they would be distributed by national media.

112.

Hughes made these statements to protect Emory with the understanding that they could and likely would destroy Professor Zwier's legal career

113.

Hughes' written, defamatory statements injured Professor Zwier in his trade and business and are actionable as libel *per se*.

114.

Libel *per se* claims do not require proof of special damages and are left to the enlightened conscience of the jury.

115.

Nevertheless, Hughes' written, defamatory statements have caused Professor Zwier to suffer direct damages in the form of lost wages, benefits, pre-judgment

and post-judgment interest, mental pain and suffering and reasonable attorneys' fees.

## **JURY DEMAND**

116.

Plaintiff demands a trial by jury on all claims so triable.

## **Prayer for Relief**

WHEREFORE, Plaintiff respectfully requests that the Court:

1) Order a jury trial on all issues so triable;

2) Enter judgment against Defendants on all Counts herein;

3) Award Plaintiff compensatory and punitive damages against Defendants;

4) Award Plaintiff full back pay and benefits;

5) Award pre- and post-judgment interest at the maximum rates allowable by law;

6) Award Plaintiff his reasonable attorneys' fees and litigation costs; and

7) Award such other relief as the Court deems just and proper.

Submitted this 6th day of August, 2020.

*/s/ A. Lee Parks, Jr.*
A. Lee Parks, Jr.
Georgia Bar No. 563750
lparks@pcwlawfirm.com
M. Travis Foust
Georgia Bar No. 104996
tfoust@pcwlawfirm.com

**PARKS, CHESIN & WALBERT, PC**
75 Fourteenth Street, 26th Floor
Atlanta, GA 30309
(404) 873-8000 Telephone
(404) 873-8050 Fax
***Counsel for Plaintiff***